UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TAWOS AMOKHAN,<br><br>Petitioner,<br>v.<br><br>MARKWAYNE MULLIN et al.,<br><br>Respondents. | CASE NO. 2:26-cv-02853-LK<br><br>ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS |

This matter comes before the Court on Petitioner Tawos Amokhan's petition for a writ of habeas corpus. Dkt. No. 1. For the reasons discussed below, the Court grants the petition in part and denies it in part.[1]

## I. BACKGROUND

Amokhan is a native and citizen of Afghanistan. Dkt. No. 5 at 2. On September 9, 2021, he was paroled into United States pursuant to section 212(d)(5) of the Immigration and Nationality

[1] The Court declines to hold an evidentiary hearing because the record is sufficient for adjudication of the petition. *See Owino v. Napolitano*, 575 F.3d 952, 954 (9th Cir. 2009) (holding that "the district court must hold an evidentiary hearing" where "the record is insufficient to decide whether [the petitioner's] detention is authorized").

Act ("INA"), 8 U.S.C. § 1182(d)(5), at Dulles International Airport in Virginia. *Id.* His parole expired on September 8, 2025. *Id.*

According to Amokhan, on December 19, 2025, he visited Peace Arch Park in Blaine, Washington with a friend, and "Canadian officials encountered him at the park and treated him as having sought entry into Canada, which he had not intended." Dkt. No. 1 at 6. He avers that "Canadian officials required him to sign paperwork before returning him to the United States, where United States Customs and Border Protection reviewed his documents" and took him into custody. *Id.*

According to Deportation Officer Christopher Hubbard, United States Customs and Border Protection ("CBP") encountered Amokhan at the Port of Entry in Blaine, Washington, after Canada denied him entry pursuant to the Safe Third County Agreement ("STCA"). Dkt. No. 5 at 2. "When questioned by CBP about his time in Canada, [Amokhan] responded that he intended to have a picnic at the border but ended up in Canada after a wrong turn." *Id.* Deportation Officer Hubbard avers that Amokhan applied for asylum in Canada, that claim was denied, and he was returned to the United States. *Id.*

CBP determined that Amokhan did not possess documents that would "allow his admission to or continued parole in the United States." *Id.* CBP issued him a Notice to Appear ("NTA"), charging him as an arriving alien who is inadmissible under section 212(a)(7)(A)(i)(I) of the INA, and scheduled him to appear before an immigration judge ("IJ") in removal proceedings. *Id.* at 2–3; Dkt. No. 6-1 at 2, 5 (NTA stating, "You are an arriving alien" and charging removability under Section 212(a)(7)(A)(i)(I)).[2] Amokhan was arrested and transferred to the custody of U.S. Customs

[2] *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I) (stating that noncitizens are "inadmissible" when they are "not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title").

and Immigration Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. Dkt. No. 5 at 3.

Amokhan filed an application for asylum on September 22, 2023. Dkt. No. 1 at 6. He had his final merits hearing on March 9, 2026. Dkt. No. 5 at 3. At the conclusion of the hearing, the IJ denied his application for relief and ordered him removed to Afghanistan. *Id.*; Dkt. No. 6-4 at 2–5. Amokhan filed an appeal with the Board of Immigration Appeals ("BIA"), which denied his appeal as untimely. Dkt. No. 5 at 3; Dkt. No. 6-5 at 4–5.

On June 12, 2026, Amokhan filed a Petition for Review with the United States Court of Appeals for the Ninth Circuit, and that appeal is pending. *Amokhan v. Blanche*, No. 26-3815, Dkt. No. 1 (9th Cir. June 12, 2026). That court entered a temporary stay of removal on July 31, 2026, which remains in effect until further order of the court. *Id.*, Dkt. No. 13 (9th Cir. July 31, 2026).

Amokhan has not requested a bond hearing during his removal proceedings. Dkt. No. 5 at 3. He did request a custody redetermination and was "informed that he was ineligible for bond by reason of his classification as an arriving alien." Dkt. No. 1 at 7.

According to Deportation Officer Hubbard, ERO requested that Amokhan "prepare or assist in the preparation of his travel document package to Afghanistan" in May 2026, but he refused. Dkt. No. 5 at 4. "A travel document package is necessary for Afghanistan to generate a transportation letter for those removed to Afghanistan from the United States." *Id.* at 3. A petitioner's refusal to cooperate and produce identity documents "does not stop the request" for a transportation letter to Afghanistan, but it "lengthens [the process] and makes the date unpredictable." *Id.* at 5.

Amokhan filed a petition for a writ of habeas corpus on August 11, 2026. Dkt. No. 1. Respondents[3] filed a return, Dkt. No. 4, and Amokhan filed a traverse, Dkt. No. 7.

On September 1, 2026, the Court ordered the parties to file supplemental briefing regarding Amokhan's August 21, 2026 custody determination. Dkt. No. 8. The Court ordered Respondents to file a copy of the decision, along with any related evidence including a recording of the hearing (if one was conducted), and a supplemental brief of up to six pages addressing the constitutional sufficiency of the custody determination. *Id.* Respondents filed a supplemental brief, alongside a Notice of Alien File Custody Review and a Decision to Continue Detention. Dkt. Nos. 9, 10-1, 10-2. The Notice to Alien of File Custody Review shows that on July 13, 2026, Amokhan was notified that his file would be reviewed on August 21, 2026. Dkt. No. 10-1 at 2–3. The subsequently issued Decision to Continue Detention checked a box stating, "You have not demonstrated that, if released, you will not pose a significant risk of flight pending your removal from the United States." Dkt. No. 10-2 at 2. It also stated that ICE made this flight risk determination "[b]ased on [Amokhan's] immigration history and lack of community ties[.]" *Id.* In their supplemental brief, Respondents state that custody review was conducted "because ICE is subject to a separate, nationwide regulatory and statutory obligation to periodically review the custody of individuals subject to administratively final orders of removal." Dkt. No. 9 at 2 (citing 8 C.F.R. § 241.4(h); 8 U.S.C. § 1231). On September 22, 2026, Amokhan filed a timely supplemental response stating that the custody review does not change the nature of his claims. Dkt. No. 11 at 1–2.

---

[3] Although Bruce Scott, the warden of the NWIPC, has not appeared in this case, (1) the purpose of naming the petitioner's custodian is to effectuate injunctive relief where appropriate, *see Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (the custodian has "the power to produce the body of [the petitioner] before the court or judge," such that "he may be liberated if no sufficient reason is shown to the contrary." (citation modified)); and (2) federal respondents often represent the warden's interests, as they do in this case, *see Doe v. Garland*, 109 F.4th 1188, 1196 (9th Cir. 2024) ("Even in cases where private contract wardens are named as respondents, the government can and has stepped in to defend its interest in keeping petitioners detained.").

## II. DISCUSSION

Amokhan argues that Respondents violated his due process rights by failing to provide any notice or opportunity to be heard before his re-detention. Dkt. No. 1 at 16. He contends that due process required the provision of an individual custody hearing when the government "seized him" at the border. *Id.* at 11 (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). He also argues that his detention has become "unreasonably prolonged." *Id.* at 13 (quoting *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1117 (W.D. Wash. 2019)). He seeks immediate release; a permanent injunction prohibiting "his re-detention during the pendency of his removal proceedings absent written notice and a hearing prior to re-detention"; a declaration that his "re-detention while removal proceedings are ongoing without first proving an individualized determination before a neutral decisionmaker violates the Due Process Clause of the Fifth Amendment"; and attorney's fees. *Id.* at 17.

Respondents argue that Amokhan is subject to mandatory detention as an "arriving alien" because he entered the country as an arriving alien, he reverted to that status when his parole expired, and any "implied grant of parole" that could have existed after his parole expired "terminated automatically upon his December 19, 2025, departure from the United States." Dkt. No. 4 at 8–10. They argue that he is thus "properly held under § 1225(b)(2)(A)." *Id.* at 11.

### A. Legal Standard

The Constitution guarantees the availability of the writ of habeas corpus "to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art I, § 9, cl. 2). "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). A writ of habeas corpus may be granted to a petitioner who demonstrates that he is in custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3). Historically, "the writ of habeas corpus has

served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). Accordingly, a district court's habeas jurisdiction includes challenges to immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001). "Once a [constitutional] right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Roman v. Wolf*, 977 F.3d 935, 942 (9th Cir. 2020) (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)).

Under the Due Process Clause of the Fifth Amendment to the United States Constitution, no person shall be "deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. "The Fifth Amendment guarantees due process in deportation proceedings." *Torres-Aguilar v. I.N.S.*, 246 F.3d 1267, 1270 (9th Cir. 2001). "[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693; *see also Demore v. Kim*, 538 U.S. 510, 523 (2003) (recognizing that Fifth Amendment due process protections extend to deportation proceedings, but noting that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process").

**B. Amokhan Is Detained Pursuant to Section 1225(b)**

Like many petitions before the Court, Amokhan's petition pays minimal attention to the statute to which he is subject, and instead essentially insists that due process demands the same procedures no matter which statute applies. *See, e.g.*, Dkt. No. 1 at 9–10. But the Ninth Circuit has rejected such a proposition, and this Court does too. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022). The applicable statute matters because the constitutional process required is not necessarily the same for "different statutory provision[s] with [their] own procedural safeguards in place[.]" *Id.*; *see, e.g.*, *id.* at 1203 (because "§ 1226(a) provides substantially

different procedures than the provisions [the court had] examined in the past," the court could not accept petitioner's "suggestion that [the court's decisions regarding other detention provisions] mandate[d] the same procedural relief in this case"); *Demore*, 538 U.S. at 529 n.11 (in response to a dissent "suggesti[ng] that [noncitizens] are entitled to an immediate hearing," pointing to *Zadvydas*, in which the Supreme Court "permit[ed] [noncitizens] to be detained for several months prior to such a hearing").

As noted above, Respondents contend that Amokhan is subject to mandatory detention as an "arriving alien" and thus "properly held under § 1225(b)(2)(A)." Dkt. No. 4 at 11. Amokhan does not dispute that point, but argues that his statutory classification is "irrelevant" because his detention has become "unconstitutionally prolonged[.]" Dkt. No. 1 at 9–10. He contends that "the question presented is therefore not whether Respondents possessed authority to detain [him] on December 19, 2025," but rather "whether they may continue to detain him for 234 days without any individualized custody determination, where the immigration court was without jurisdiction to conduct one." *Id.* at 10. At the same time, he argues that he was entitled to an individualized custody determination under *Mathews* "when Respondents seized him" at the border. *Id.* at 11.

The Court agrees with Respondents that Amokhan is detained pursuant to Section 1225(b). Once Amokhan's parole ended, Section 1182 required that he "be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). An "applicant for admission" refers to "[a]n alien present in the United States who has not been admitted or who arrives in the United States." *See id.* § 1225(a)(1). Amokhan was paroled into the United States under 8 U.S.C. § 1182(d)(5). Dkt. No. 5 at 2; Dkt. No. 6-3 at 2. Thus, on September 8, 2025, when his parole ended, Dkt. No. 5 at 2, Amokhan was again subject to Section 1182(d)(5) as an "applicant for admission." This status is confirmed by the NTA issued after he returned from

Canada, charging him as an arriving alien who is inadmissible under Section 212(a)(7)(A)(I) of the INA. Dkt. No. 5 at 2–3; *see also Piloto-Rodriguez v. Warden Broward Transitional Ctr.*, No. 0:26-CV-60901, 2026 WL 1434335, at *3 (S.D. Fla. May 6, 2026) ("[T]he Court must evaluate the statutory basis for Petitioner's detention based on his latest Notice to Appear"); *report and recommendation adopted,* 2026 WL 1432456 (S.D. Fla. May 21, 2026). Finally, this is not a case "where a petitioner has been treated by [the federal government] as subject to discretionary detention under section 1226," making Section 1226 "more likely to apply." *Del Valle Castillo v. Wamsley*, No. 2:25-CV-02054-TMC, 2025 WL 3524932, at *5 (W.D. Wash. Nov. 26, 2025) (citation modified). Accordingly, Amokhan is subject to Section 1225(b) and lawfully detained under Section 1225(b)(1)(B)(ii), which states that noncitizens "shall be detained for further consideration of the application for asylum." *See also Jennings v. Rodriguez*, 583 U.S. 281, 302 (9th Cir. 2018) (finding that Section 1225(b) "mandate[s] detention of [noncitizens] throughout the completion of applicable proceedings"). Amokhan does not argue that he was denied any process owed to him by Section 1225(b) or its implementing regulations. *See generally* Dkt. No. 1.

Amokhan's border crossing (even if inadvertent) and the resulting automatic end of his parole also undermine his contention that he had a due process right to notice or opportunity to be heard before his re-detention. Dkt. No. 1 at 16. As Respondents argue, "even if the Court were to find DHS had impliedly extended Petitioner's grant of parole by not immediately re-detaining him upon its expiration in September 2025, Petitioner's hypothetical, implied grant of parole would have terminated automatically upon his December 19, 2025, departure from the United States." Dkt. No. 4 at 10; *see also* 8 C.F.R. § 212.5(e)(1)(i) (explaining that a grant of parole "shall be automatically terminated without written notice" upon the noncitizen's "upon the departure from the United States."). Accordingly, when Amokhan crossed the border and was returned to this

country, his detention was mandatory, and he was not entitled to notice or a hearing before he was re-detained under the statute or due process. *Raj v. Mullin*, No. C26-1323-KKE, 2026 WL 1300423, at *3 (W.D. Wash. May 12, 2026) (finding that Petitioner was not entitled to a pre-deprivation hearing before his parole could be revoked when he left the United States for Canada); *Mohan v. Noem*, No. 2:26-CV-00534-TMC, 2026 WL 764176, at *3 (W.D. Wash. Mar. 18, 2026) ("Because Petitioner was seeking admission to the country when he was detained at a port of entry, his mandatory detention pursuant to § 1225(b)(2)(A) does not violate the INA or his due process rights."). The Court thus turns to Amokhan's contention that his current lengthy detention without a bond hearing violates his due process rights.

**C. Amokhan Has Established a Due Process Violation**

Amokhan contends that his detention has become "unreasonably prolonged," entitling him to a bond hearing under *Banda*. Dkt. No. 1 at 13 (citing *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1117 (W.D. Wash. 2019)). He argues that the *Banda* factors are either neutral or weigh in his favor. *Id.* at 13–16. Respondents argue that Amokhan's continued detention is consistent with the *Banda* factors. Dkt. No. 4 at 16–17.

Neither the Supreme Court nor the Ninth Circuit has settled on a test for assessing the constitutionality of prolonged mandatory detention. *Banda*, 385 F. Supp. 3d at 1116. Consequently, "district courts have grappled with how to address due process challenges to prolonged mandatory detention under § 1225(b)." *Id.* "Nearly all district courts that have considered the issue agree that prolonged mandatory detention pending removal proceedings, without a bond hearing, will—at some point—violate the right to due process." *Id.* (citation modified); *see also Kumar v. Hermosillo*, No. 2:26-cv-00389-JNW, 2026 WL 523276, at *2 (W.D. Wash. Feb. 25, 2026) (quoting *Banda*, 385 F. Supp. 3d at 1116).

The court in *Banda* declined to apply the *Mathews* test because it was not analyzing "the question of 'whether the administrative procedures provided . . . are constitutionally sufficient.'" 385 F. Supp. at 1106 (quoting *Mathews*, 424 U.S. at 334). Instead, it was resolving "the more fundamental issue of whether any procedure—such as a bond hearing—must be provided," so a case-specific, multi-factor analysis was appropriate. *Id.* at 1106–07; *see also Amatbek Uulu v. Scott*, No. 2:26-cv-00774-LK, 2026 WL 865813, at *5 (W.D. Wash. Mar. 30, 2026) (distinguishing the two tests). In addition, the parties agree that Amokhan's August 21, 2026 custody determination is not relevant to his alleged deprivation of due process. Dkt. No. 9 at 2 (Respondents stating that their "constitutional analysis remains governed by the *Banda* factors" and affirming that they are not contending that Amokhan's August 21, 2026 custody determination "independently satisfies, supplements, or replaces any of the *Banda* factors."). Amokhan argues that the custody review did not provide the required due process or cure his alleged constitutional defect: "after more than nine months of confinement, no neutral decisionmaker has ever determined through an individualized hearing that [his] detention is necessary because he presents a danger or flight risk." Dkt. No. 11 at 1–3. The Court therefore applies the *Banda* test to determine whether due process entitled Amokhan to any procedure—such as a bond hearing—while he is detained. *See, e.g.*, *Hong v. Mayorkas*, No. 2:20-cv-1784-LK, 2022 WL 1078627, at *4 (W.D. Wash. Apr. 11, 2022).

Under *Banda*, a court evaluates: "(1) the total length of detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by the detainee; (5) delays in the removal proceedings caused by the Government; and (6) the likelihood that the removal proceedings will result in a final order of removal." 385 F. Supp. 3d at 1106. The first factor—the total length of detention to date—is the "most important factor." *Banda*, 385 F. Supp. 3d at 1118. Amokhan argues that this factor weighs in his favor because he

has been detained since December 19, 2025, "a period of 234 days" at the time he filed his petition on August 11, 2026. Dkt. No. 1 at 13. Respondents "acknowledge that his detention has become prolonged," but contend that "this Court should note that the current length of his detention has not reached the length of what many courts have found to be unreasonable." Dkt. No. 4 at 16. Amokhan has been held for more than nine months, which weighs in his favor. *See, e.g.*, *Kumar*, 2026 WL 523276, at *2 (finding the first factor weighed in favor of the petitioner, who had been held for "about ten months as of the date of th[e] order"); *Ashemuke v. ICE Field Off. Dir.*, No. 2:23-cv-1592-RSL, 2024 WL 1683797, at *4 (W.D. Wash. Feb. 29, 2024) (finding that eleven months of detention weighed in petitioner's favor).

Amokhan contends that the second factor—the likely duration of future detention—weighs in his favor because a stay of removal is in effect, "Respondents' response concerning the stay of removal is not due until September 25, 2026," and merits briefing and a decision will follow after that at some unknown date. Dkt. No. 1 at 14. Consequently, "[c]ontinued detention is . . . untethered from any imminent removal event, and its endpoint is presently undetermined." *Id.* Respondents acknowledge that in light of the current stay of removal and procedural posture before the Ninth Circuit, "[a]ny estimate of future detention would be speculative, at best." Dkt. No. 4 at 17. The Court agrees with Respondents that this factor is neutral. *Kumar*, 2026 WL 523276, at *3 (finding this factor neutral when an endpoint was speculative).

Amokhan contends that the third factor—regarding the conditions of his confinement—weighs in favor because he has been detained at the NWIPC since December 2019, and "[c]ourts in this District have routinely found that this factor favors petitioners detained at that facility." Dkt. No. 1 at 14. Respondents do not dispute that this factor weighs in Amokhan's favor, Dkt. No. 4 at 17, so the Court finds that it does. The Court also finds that the fourth and fifth factors are neutral

because, as the parties contend, neither Amokhan nor the government has engaged in bad faith or delayed the immigration proceedings. Dkt. No. 1 at 15; Dkt. No. 4 at 17.

The sixth *Banda* factor requires the Court to consider the likelihood that removal proceedings will result in a final order of removal. *Banda*, 385 F. Supp. 3d at 1120. Amokhan argues that this factor is neutral because although "[a] removal order has been entered and administratively affirmed," the Ninth Circuit has stayed the removal order and is adjudicating his petition for review. Dkt. No. 1 at 15. Amokhan "does not ask this Court to predict the outcome of that proceeding," and contends that the Court "lacks adequate information to opine on the potential merits of it." *Id.* (citation modified). Respondents agree that this factor is neutral because "the Court cannot predict whether the Ninth Circuit will grant or deny the petition for review[.]" Dkt. No. 4 at 17. The Court finds that this sixth factor is neutral because it lacks sufficient information to evaluate whether Amokhan will prevail before the Ninth Circuit. *Kumar*, 2026 WL 523276, at *3 (finding this factor neutral when the court lacked sufficient information to determine if the petitioner would prevail).

In sum, two of the factors—the length of detention and the conditions of confinement—weigh in Amokhan's favor. The rest of the factors are neutral.

**D. The Remedy**

Weighing the *Banda* factors, the Court finds that Amokhan's "continued mandatory detention under § 1225(b) has become unreasonable and that due process requires the Government to provide him with a bond hearing." *Banda*, 385 F. Supp. 3d at 1120. However, the Court declines to order Amokhan's release as he requests. Dkt. No. 1 at 17. Courts in this district have "ordinarily declined to order immediate release" for petitioners in prolonged detention pursuant to Section 1225(b) and instead ordered a bond hearing. *Kumar*, 2026 WL 523276, at *4; *see also Hong*, 2022

WL 1078627, at *7. The Court agrees with those decisions and concludes that the proper remedy is an individualized bond hearing.

Amokhan argues that at the bond hearing, the government should be held to a clear and convincing standard of proof. Dkt. No. 1 at 16. Respondents do not address this request in their return. *See generally* Dkt. No. 4. Based on Respondents' non-opposition and the particular and unique circumstances here, the Court requires the government to prove that Amokhan is a danger to the community or flight risk by clear and convincing evidence. *Mathews*, 424 U.S. at 335.

Finally, Amokhan requests an order "permanently enjoin[ing] his re-detention during the pendency of his removal proceedings absent written notice and a hearing prior to re-detention[.]" Dkt. No. 1 at 17. Respondents do not specifically address this request. *See generally* Dkt. No. 4. Where, as here, habeas petitioners raise due process claims and have also invoked the Court's jurisdiction under 28 U.S.C. § 1331, the Court has "the authority both to entertain [the petitioner's] constitutional challenges and to grant injunctive relief in response to them," "irrespective of the accompanying habeas petition." *Roman*, 977 F.3d at 941–42. Importantly, though, "[i]n seeking a permanent injunction, the moving party must convince the court that relief is needed: 'The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'" *Cummings v. Connell*, 316 F.3d 886, 897 (9th Cir. 2003) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). Nowhere in Amokhan's petition does he establish that his release is warranted, allege that re-detention is likely if he were to be released, or allege that such detention is likely to occur without compliance with the government's regulations or policies. Without argument or evidence that those outcomes are likely to occur, Amokhan's request constitutes nothing more than a "mere possibility" of harm that does not entitle him to relief. *Id.* For these reasons, the Court

denies his request for injunctive relief regarding a potential future, post-release re-detention hearing.[4]

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Amokhan's petition for a writ of habeas corpus, Dkt. No. 1, and ORDERS as follows:

1. Respondents must provide Amokhan with a bond hearing before an immigration judge within 14 days of the date of this Order unless Amokhan successfully requests an extension of that deadline; any extensions successfully requested by Amokhan toll the 14-day period. Respondents must ensure that the bond hearing is recorded.

2. If a bond hearing is not provided within 14 days of the date of this Order and Amokhan has not requested an extension of that deadline, Amokhan shall be released from ICE custody within 24 hours on appropriate conditions of supervision, taking into account his ability to pay a bond.

3. Respondents must file a Status Report with the Court either confirming that Amokhan received a bond hearing—and the results of that hearing—or otherwise confirming his release by October 16, 2026.

5. Any fee petition should be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412. *See Michelin v. Warden Moshannon Valley Corr. Ctr.*, 169 F.4th 418, 428 (3d Cir. 2026) (the Equal Access to Justice Act authorizes award of attorney's fees to petitioners who prevail against the Government in immigration habeas actions); *Daley v. Ceja*, 158 F.4th 1152, 1162 (10th Cir. 2025) (same); *Vacchio v. Ashcroft*, 404 F.3d 663, 672 (2d Cir.

[4] Respondents improperly ask the Court to "direct [Amokhan] to cooperate with DHS in effectuating his removal" if the Ninth Circuit resolves his merits petition for review in the government's favor. Dkt. No. 4 at 17. Even ignoring that requests for relief should be submitted by motion and not in a return, Fed. R. Civ. P. 7(b)(1), the Court declines to issue an advisory opinion on a hypothetical future event.

2005) (same); *see also Petition of Hill*, 775 F.2d 1037, 1041 (9th Cir. 1985) (reasoning that an award of fees under EAJA was not necessarily foreclosed for a habeas petition brought by "a nonresident [noncitizen]" in the immigration context). Time spent on work that is "excessive, redundant, or otherwise unnecessary" is not compensable. *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992) (citation modified). For example, attorneys may not seek compensation for time spent developing a habeas petition template when such template was merely re-used in the instant proceeding; only the time spent dedicated to this proceeding is compensable. *See Eve Nevada, LLC v. Derbyshire*, No. 21-0251-LK, 2022 WL 279030, at *10 (W.D. Wash. Jan. 31, 2022).

Dated this 1st day of October, 2026.

Lauren King
United States District Judge